**P.J. MAFFEI BUILDING WRECKING CORPORATION, Appellant,**

**v.**

**The UNITED STATES, Appellee.**

**Appeal No. 83–1228.**

United States Court of Appeals, Federal Circuit.

April 19, 1984.

---

Alvin S. Nathanson, Boston, Mass., for appellant.

Robert M. Hollis, Washington, D.C., for appellee. With him on the brief were J. Paul McGrath, Asst. Atty. Gen., and David M. Cohen, Director, Washington, D.C.

Before DAVIS, Circuit Judge, SKELTON, Senior Circuit Judge, and BALDWIN, Circuit Judge.

DAVIS, Circuit Judge.

This appeal is from a decision of the United States Claims Court, granting summary judgment for the appellee, the United States (the Government), and dismissing appellant P.J. Maffei Building Wrecking Corporation's (Maffei's) claim that the General Services Board of Contract Appeals (the Board) incorrectly held that Maffei was not entitled to an equitable adjustment for a shortfall of salvageable steel in its demolition contract with the Government.[1] We affirm, but partially for different reasons than those advanced by the Claims Court.

I

In June 1976 the Government issued an Invitation for Bids (IFB) for the demolition and removal of the United States Pavilion (and restoration of the grounds) in Flushing Meadow Park, New York. The Pavilion had been built for the 1964 World's Fair. The IFB advised prospective contractors that the salvage value of the construction materials to be removed from the project site should be reflected in the bids, because those materials would become the property of the contractor. This appeal primarily concerns the proper construction and application of another IFB provision, found in the Special Conditions section:

1.2 Some drawings of some of the existing conditions are available for examination at the New York City Parks Department's Administration Building at Flushing Meadow Park, Flushing, New York. These drawings are for information only and will not be part of the contract documents. The quantity, quality, complete-

---

1. The Claims Court also dismissed another claim (the Pile Claim) raised by Maffei in connection with its demolition contract. Maffei does not appeal the court's decision on this issue, and we do not consider it.

ness, accuracy and availability of these drawings are not guaranteed. Prospective bidders shall telephone Mr. S. Dubowy or Mr. S. Adler of the New York City Parks Department, at 212–699–4288, for an appointment to examine drawings of the existing conditions.

Maffei's estimator, Laurence Brady, Jr., visited the site, reviewed drawings he obtained from a man named "Charlie" at the Parks Department, consulted a "steel book,"[2] and subsequently arrived at a bid based on his estimate of the amount of salvageable steel in the Pavilion. On October 7, 1976, the Government awarded Maffei the demolition contract.

Maffei recovered 1,075 tons of steel less (approximately 20%) than it had estimated it would salvage from the project. Contending that the Government owed it compensation for the shortfall under the Differing Site Conditions clause of its contract, Maffei submitted a claim to the Government for an equitable adjustment of the contract price. The Differing Site Conditions clause provides:

> The Contractor shall promptly, and before such conditions are disturbed, notify the Contracting Officer in writing of: (1) Subsurface or latest [sic for latent] physical conditions at the site differing materially from those *indicated in this contract,* or (2) unknown physical conditions at the site, of an unusual nature, differing materially from those ordinarily encountered and generally recognized as inhering in work of the character provided for in this contract.[3] The Contracting Officer shall promptly investigate the conditions, and if he finds that such conditions do materially so differ and cause an increase or decrease in the Contractor's cost of, or the time required for, performance of any part of the work under this contract, whether or not changed as a result of such conditions, an equitable adjustment shall be made and the contract modified in writing accordingly. (Emphasis added.)

The contracting officer denied Maffei's claim on the ground that the Government had explicitly excluded the drawings upon which Maffei allegedly relied from the contract's coverage and disclaimed their accuracy. *See* IFB provision 1.2, *supra.* He also said that the IFB required that prospective contractors estimate salvageable structural steel through on-site inspection and examination.

On appeal, the General Services Board of Contract Appeals affirmed the contracting officer's denial of Maffei's claim for an equitable adjustment for the steel shortfall. *P.J. Maffei Building Wrecking Corporation,* 80–2 B.C.A. (CCH) ¶ 14,647 (August 1980). It decided that the contract contained no "indication" of the amount of steel in the Pavilion. The Board said:

> ... the contract provided the appellant with no information or estimate of the type or quantity of steel in the building. The Government was aware that some drawings pertaining to the structural steel were available at the Parks Department. The drawings were to serve as a source for providing potential bidders with leads to more reliable information, such as the as-built drawings or the contractor who installed the steel.

*Id.,* at 72,259. The Board also held against Maffei on its claim that the Government had misrepresented by withholding pertinent information.

In 1981 Maffei sought review of the Board's decision on these claims in the then United States Court of Claims under the Wunderlich Act, 41 U.S.C. §§ 321–322 (1976).[4] On October 1, 1982, the case was

---

**2.** The "steel book" is said to give information on the weight of each piece of steel shown in the drawings. Brady did not obtain this book from the Parks Department, and it was not offered in evidence before the Board.

**3.** Only the first category of causes (Type I) for increased costs is relevant to this appeal. The Board rejected the applicability of the second category of costs (Type II), and the correctness of that rejection was not contested in the Claims Court and is not an issue here.

**4.** Though Maffei could apparently have sought review under the Contract Disputes Act, if it

transferred to the United States Claims Court by the Federal Courts Improvement Act of 1982, Pub.L. No. 97–164, 96 Stat. 25 (April 2, 1982). Both Maffei and the Government moved for summary judgment.

The Claims Court granted the Government's cross-motion for summary judgment and dismissed Maffei's claims. Although the court upheld the Board's determination, it did so on the basis that Maffei had not shown that it actually relied on the information shown in the drawings. In contrast to the Board, the Claims Court ruled that the Government's reference to the drawings in the IFB was sufficient to satisfy the requirement of a "contract indication" under the Differing Site Conditions clause. That reference, however, did not amount to a misrepresentation (in the Claims Court's view) because it came replete with caveats. The Claims Court also found, like the Board, that Maffei had failed to show that the Government concealed any information. *P.J. Maffei Building Wrecking Corp. v. United States*, 3 Cl.Ct. 482 (1983).

## II

We uphold the Claims Court's grant of summary judgment for the Government and dismissal of Maffei's claim for an equitable adjustment of the contract price. The ground for our decision, however, is the position rejected by the Claims Court. Unlike that court, we agree with the Board that the contract documents did *not* "indicate" the amount of steel recoverable from the Pavilion, within the meaning of the Differing Site Conditions clause. We also decide (as did the Claims Court) that Maffei failed to show that the Government misrepresented conditions at the Pavilion or that it possessed pertinent information regarding the Pavilion steel structure which it concealed.

### Differing Site Conditions Claim

■ Success on a Type I Differing Site Conditions claim [5] turns on the contractor's

ability to demonstrate that the conditions "indicated" in the contract differ materially from those it encounters during performance. *Arundel Corporation v. United States*, 515 F.2d 1116, 1128 (Ct.Cl.1975). As a threshold matter, then, this kind of Differing Site Conditions claim is dependent on what is "indicated" in the contract. *Foster Construction C.A. and Williams Brothers Company v. United States*, 435 F.2d 873, 881 (Ct.Cl.1970). A contractor cannot be eligible for an equitable adjustment for changed conditions unless the contract indicated what those conditions would supposedly be. *S.T.G. Construction Co., Inc. v. United States*, 157 Ct.Cl. 409, 414 (1962).

■ In this case, we cannot accept the view that the Government's reference, in the IFB, to structural drawings available from the New York City Parks Department amounted to an "indication," representation, or undertaking by the Government that the dimensions of the steel in the Pavilion were accurately or reliably depicted by the drawings. While it is true that a contract "indication" need not be explicit or specific, the contract documents must still provide sufficient grounds to justify a bidder's expectation of latent conditions materially different from those actually encountered. *Foster Construction, supra*, at 875. "[T]here must be reasonably plain or positive indications in the bid information or contract documents that such subsurface conditions would be otherwise than actually found in contract performance ...." *Pacific Alaska Contractors, Inc. v. United States*, 436 F.2d 461, 469 (Ct.Cl. 1971).

■ Determining whether Maffei's contract with the Government contained any "indications" regarding the steel within the Pavilion is a matter of contract interpretation and thus presents a question of law which may be decided by this court for itself. *Foster Construction, supra*, at

---

wished to, it chose to rely solely on the Wunderlich Act (an option also open to it).

**5.** *See* note 3, *supra*.

880; *Hercules Inc. v. United States*, 626 F.2d 832, 835 (Ct.Cl.1980); *B.D. Click Co., Inc. v. United States*, 614 F.2d 748, 752 (Ct.Cl.1980). A proper technique of contract interpretation on this problem is for the court to place itself "into the shoes of a 'reasonable and prudent' contractor" and decide how such a contractor would act in appellant's situation. *H.N. Bailey & Associates v. United States*, 449 F.2d 387, 390 (Ct.Cl.1971); *Hegeman-Harris & Co., Inc. v. United States*, 440 F.2d 1009, 1016 (Ct. Cl.1971).

From this vantage point of the "reasonable contractor" or "reasonable bidder," we see that IFB provision 1.2 can be interpreted only as an effort by the Government to direct prospective contractors to information which might prove helpful in formulating their bids, but not as proffering any specific information bearing directly on the steel conditions to be found. First, the provision made clear that the documents were not in the possession of the federal government, but rather of the New York City Parks Department. Second, the clause expressly stated that the drawings were "for information only," that they would "not be part of the contract documents," and that their "quantity, quality, completeness, accuracy and *availability* ... [were] not guaranteed." (Emphasis added.) The Government's warning regarding availability provided a particularly clear signal to prospective contractors that the Government did not intend them to rely on the structural drawings, since it could not even guarantee that they would be able to view any or all of these drawings. Third, the provision referred only to "some" drawings of "some" of the "existing conditions"—not specifying in any way what part of the drawings would be available at the Parks Department or which part of the "existing conditions" would be shown on the available drawings; in particular, the provision referred very generally to "some" of the "existing conditions," not to the steel included within the structure or even to the construction of the buildings.

■ In these circumstances, we believe that Maffei's alleged reliance [6] on the New York City Parks Department drawings for its estimate of salvageable steel was not justified. While a contractor need not demonstrate that its interpretation of the contract is the *only* reasonable one, it does bear the burden of showing that its construction is at least a reasonable reading. *Max Drill, Inc. v. United States*, 427 F.2d 1233, 1245 (Ct.Cl.1970). This Maffei has failed to do. The Government went as far as it could to show that it did not expect any real reliance to be placed on those drawings, especially with respect to salvage materials.[7] The provision put prospective contractors on notice that the Government did not warrant the accuracy

6. The Claims Court found that Maffei had not demonstrated actual reliance on the structural drawings. Maffei contends that this finding was contrary to the facts found by the Board. Because we decide that Maffei did not have a legal right to rely on the drawings, we do not reach this issue.

7. In fact, this clause in the bid solicitation was amended during the bid process to make even plainer that no reliance should be rested on the drawings. The original clause provided:

1.2 Drawings of the existing conditions are available for examination at the New York City Parks Department's Administration Building at Flushing Meadow Park, Flushing, New York. These drawings are for information only and will not be part of the contract documents. The accuracy of these drawings is not guaranteed. Prospective bidders shall telephone Mr. S. Dubowy or Mr. S. Adler of the New York City Parks Department, at 212–699–4288, for an appointment to examine drawings of the existing conditions.

Some time later (before the bids were to be opened) that very clause was significantly changed to read (we add emphasis to the new words):

1.2 *Some* drawings of *some of* the existing conditions are available for examination at the New York City Parks Department's Administration Building at Flushing Meadow Park, Flushing, New York. These drawings are for information only and will not be part of the contract documents. The *quantity, quality, completeness,* accuracy *and availability* of these drawings are not guaranteed. Prospective bidders shall telephone Mr. S. Dubowy or Mr. S. Adler of the New York City Parks Department, at 212–699–4288, for an appointment to examine drawings of the existing conditions.

of the drawings, did not expect the steel dimensions drawn from the drawings to be used by contractors as if they were accurate, and did not in any other way encourage contractors to rely on the drawings in formulating their bids. Maffei's interpretation of the provision as a representation or as containing an understanding that the structural steel in the Pavilion would have the dimensions depicted in the drawings (and that bids could be figured on that basis) is not reasonable.[8] To hold otherwise would effectively render the Government unable to direct a potential contractor to possibly helpful information without undertaking to stand on that information's accuracy. If, on the other hand, the Government tried to protect itself from lawsuits such as this one by withholding a potential source of information, it might be found liable to a contractor for not disclosing its "superior" knowledge. *See, e.g., Hardeman-Monier-Hutcherson v. United States*, 458 F.2d 1364 (Ct.Cl.1972). The Differing Site Conditions clause cannot be read to create such a pointless predicament.

■ In sum, the solicitation placed upon Maffei the responsibility for estimating the amount of salvageable steel. To the extent that Maffei based its estimate on data given in the drawings, it assumed the risk that the information would prove inaccurate and should have taken the possibility of a shortfall into account in formulating its bid.[9] The fact that the risk materialized and that Maffei recovered less steel than it had estimated is not a sufficient ground for an equitable adjustment of the contract price.

8. We do not decide that a contractual reference to data found within a document not incorporated in the contract may never constitute an "indication" upon which the contractor may properly rely. We hold only that the contractual provision before us cannot be reasonably interpreted in that way.

9. Maffei's brief concedes that its "estimate contained no contingency for any possible variation from the measurements and weights shown on the structural steel drawings which appellant had obtained from the Parks Department." It clearly could, however, have included such a contingency.

*See, e.g., Perini Corp. v. United States,* 381 F.2d 403, 415 (Ct.Cl.1967) (faulty estimate cannot be basis for invoking benefit of Changed Conditions article [10]). Without a legal right to rely upon the Parks Department drawings, Maffei cannot shift to the Government the responsibility for an improvident bid allegedly based upon those drawings. *See id.*

Appellant's recitation of precedents holding that the Government may not escape its responsibility by exculpatory clauses is not pertinent here. This is not a case where the Government has made an explicit or implicit representation of the particular condition (at issue in the particular case) in the contract or accompanying specifications, drawings (or other documents) but nevertheless seeks to avoid responsibility for that representation by the use of general exculpatory clauses. That was true of the decisions cited by Maffei. *See, e.g., Fehlhaber Corp. v. United States,* 151 F.Supp. 817, 819 (Ct.Cl.), *cert. denied,* 355 U.S. 877, 78 S.Ct. 141, 2 L.Ed.2d 108 (1957) (contract plans and specifications described subsurface materials inaccurately); *Morrison-Knudsen Co., Inc. v. United States,* 345 F.2d 535 (Ct.Cl.1965) (data given by Government to prospective bidders along with IFB showed no permafrost in place where Government had indeed found permafrost); *Woodcrest Construction Co., Inc. v. United States,* 408 F.2d 406, 410 (Ct.Cl.1969), *cert. denied,* 398 U.S. 958, 90 S.Ct. 2164, 28 L.Ed.2d 542 (1970) (core boring logs furnished bidder by Government gave "inescapable impression" that there was no subsurface condition). In the cur-

Appellant says there was no feasible way of estimating the amount of recoverable steel other than by resort to the drawings. Even if that were so, nothing prevented the inclusion in the bid of the necessary contingency. There was likewise the possibility of consulting the original constructors of the Pavilion as to the accuracy of those particular drawings which were known not to be "as built" drawings but simply pre-construction drawings and designs.

10. The Changed Conditions clause is now called the Differing Site Conditions clause.

rent case, on the other hand, the contract provided no basis, either explicit or implicit, for any expectation regarding the amount of steel in the Pavilion. *See* our discussion, *supra*. The Government's caveats in IFB provision 1.2, *supra*, did not seek to nullify a representation as to a latent condition; rather, they are consistent with, and demonstrate, the absence of any indication that the structural drawings were accurate and should be relied upon for the amount of steel to be recovered.[11]

### Misrepresentation Claim

■ We sustain the Claims Court's holding for the Government on Maffei's misrepresentation claim. Appellant contends that the Government is liable for a material misrepresentation of fact because it (1) incorrectly identified the Parks Department drawings as depicting "existing conditions" and/or (2) withheld from Maffei information relating to the Pavilion's structure. Neither branch of this argument has merit. On the first part of the claim, we have just held, *supra*, that the IFB provision, as a whole, made no representations as to the accuracy of the structural drawings. Maffei reads the phrase "existing conditions" entirely out of context.[12] As to the second facet of the argument, we note, as did the Claims Court, that the record provides no support for Maffei's claim that the Government had more accurate information regarding the structural steel in the Pavilion than was given in the drawings. Both tribunals below so held, and we have no reason to depart from those findings. There were no different drawings (with regard to structural steel) the Government had, and no proof of any other information.

AFFIRMED.

11. In the same general class are *Caffall Bros. Forest Products, Inc. v. United States,* 678 F.2d 1071 (Ct.Cl.), *cert. denied,* 459 U.S. 908, 103 S.Ct. 212, 74 L.Ed.2d 169 (1982) and *Webco Lumber, Inc. v. United States,* 677 F.2d 860 (Ct. Cl.1982), holding that government timber "estimates" were not to be relied upon, in view of other provisions of those contracts.

12. Appellant also neglects the fact that the clause referred to "some" of the existing conditions—not stating which ones. In addition, the Parks Department drawings were not "as-built" drawings but pre-construction design drawings, and were known by appellant to be such.